

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

HYDAT YANG,                               )     No. CV 14-2138-PLA
                                          )
                    Plaintiff,            )
                                          )
            v.                            )     **MEMORANDUM OPINION AND ORDER**
                                          )
CAROLYN W. COLVIN,                        )
ACTING COMMISSIONER OF SOCIAL             )
SECURITY ADMINISTRATION,                  )
                                          )
                    Defendant.            )
_____)

**I.**

**PROCEEDINGS**

  Plaintiff filed this action on March 20, 2014, seeking review of the Commissioner's denial of his application for Disability Insurance Benefits.  The parties filed Consents to proceed before the undersigned Magistrate Judge on April 17, 2014, and April 24, 2014.  Pursuant to the Court's Order, the parties filed a Joint Stipulation on December 2, 2014, that addresses their positions concerning the disputed issues in the case.  The Court has taken the Joint Stipulation under submission without oral argument.

/

/

# II.

## BACKGROUND

Plaintiff was born on April 21, 1967. [Administrative Record ("AR") at 30, 161.] He has past relevant work experience of a hybrid job of press operator and folding machine worker.   [AR at 40, 74.]

On May 6, 2011, plaintiff filed an application for a period of disability and disability insurance benefits. [AR at 19, 161-67.]  In his application, plaintiff alleged disability beginning on March 27, 2010. [AR at 19, 161.]  After his application was denied initially and upon reconsideration, plaintiff timely filed a request for a hearing before an Administrative Law Judge ("ALJ"). [AR at 122-23.] A hearing was held on November 1, 2012, at which time plaintiff appeared represented by an attorney, and testified on his own behalf.  [AR at 19, 44-81.]  A vocational expert ("VE") also testified. [AR at 74-79.] On November 16, 2012, the ALJ denied plaintiff's claim.  [AR at 19-32.] When the Appeals Council affirmed the decision on January 28, 2014 [AR at 1-5], the decision became the final decision of the Commissioner.  See Sam v. Astrue, 550 F.3d 808, 810 (9th Cir. 2008) (per curiam) (citations omitted).  This action followed.

# III.

## STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 405(g), this Court has authority to review the Commissioner's decision to deny benefits.  The decision will be disturbed only if it is not supported by substantial evidence or if it is based upon the application of improper legal standards.  Berry v. Astrue, 622 F.3d 1228, 1231 (9th Cir. 2010) (citation omitted).

"Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Carmickle v. Comm'r, Soc. Sec. Admin., 533 F.3d 1155, 1159 (9th Cir. 2008) (internal quotation marks and citation omitted); Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1998) (same).   When determining whether substantial evidence exists to support the

2

Commissioner's decision, the Court examines the administrative record as a whole, considering

adverse as well as supporting evidence.  Mayes v. Massanari, 276 F.3d 453, 459 (9th Cir. 2001)

(citation omitted); see Ryan v. Comm'r of Soc. Sec., 528 F.3d 1194, 1198 (9th Cir. 2008) ("[A]

reviewing court must consider the entire record as a whole and may not affirm simply by isolating

a specific quantum of supporting evidence.") (internal quotation marks and citation omitted).

"Where evidence is susceptible to more than one rational interpretation, the ALJ's decision should

be upheld."  Ryan, 528 F.3d at 1198 (internal quotation marks and citation omitted); see Robbins

v. Soc. Sec. Admin., 466 F.3d 880, 882 (9th Cir. 2006) ("If the evidence can support either

affirming or reversing the ALJ's conclusion, [the reviewing court] may not substitute [its] judgment

for that of the ALJ.") (citation omitted).

### IV.

### THE EVALUATION OF DISABILITY

Persons are "disabled" for purposes of receiving Social Security benefits if they are unable

to engage in any substantial gainful activity owing to a physical or mental impairment that is

expected to result in death or which has lasted or is expected to last for a continuous period of at

least twelve months.  42 U.S.C. § 423(d)(1)(A); Drouin v. Sullivan, 966 F.2d 1255, 1257 (9th Cir.

1992).

### A.    THE FIVE-STEP EVALUATION PROCESS

The Commissioner (or ALJ) follows a five-step sequential evaluation process in assessing

whether a claimant is disabled.  20 C.F.R. §§ 404.1520, 416.920; Lester v. Chater, 81 F.3d 821,

828 n.5 (9th Cir. 1995), as amended April 9, 1996.  In the first step, the Commissioner must

determine whether the claimant is currently engaged in substantial gainful activity; if so, the

claimant is not disabled and the claim is denied.  Id.  If the claimant is not currently engaged in

substantial gainful activity, the second step requires the Commissioner to determine whether the

claimant has a "severe" impairment or combination of impairments significantly limiting his ability

3

to do basic work activities; if not, a finding of nondisability is made and the claim is denied.  Id.

If the claimant has a "severe" impairment or combination of impairments, the third step requires

the Commissioner to determine whether the impairment or combination of impairments meets or

equals an impairment in the Listing of Impairments ("Listing") set forth at 20 C.F.R. part 404,

subpart P, appendix 1; if so, disability is conclusively presumed and benefits are awarded.  Id.  If

the claimant's impairment or combination of impairments does not meet or equal an impairment

in the Listing, the fourth step requires the Commissioner to determine whether the claimant has

sufficient "residual functional capacity" to perform his past work; if so, the claimant is not disabled

and the claim is denied.  Id.  The claimant has the burden of proving that he is unable to perform

past relevant work.  Drouin, 966 F.2d at 1257.  If the claimant meets this burden, a prima facie

case of disability is established.  Id.  The Commissioner then bears the burden of establishing

that the claimant is not disabled, because he can perform other substantial gainful work available

in the national economy.  Id.  The determination of this issue comprises the fifth and final step

in the sequential analysis.  20 C.F.R. §§ 404.1520, 416.920; Lester, 81 F.3d at 828 n.5; Drouin,

966 F.2d at 1257.

**B.     THE ALJ'S APPLICATION OF THE FIVE-STEP PROCESS**

        In this case, at step one the ALJ found that plaintiff had not engaged in substantial gainful

activity since March 27, 2010, the alleged onset date.[1]  [AR at 21.]  At step two, the ALJ concluded

that plaintiff has the following severe impairments:

> [C]ervical spine strain with radicular components and MRI evidence of disc bulging
> at C5-6 and C6-7 minimally with bilateral neuroforaminal stenoses; lumbar strain
> with radicular components and MRI evidence of disc bulges at L4-L5, L5-S1 with
> mild spinal stenosis at L4-L5; right knee degeneration of the medial meniscus with
> bursitis; left elbow tendonitis; and depression.

[Id. (citations omitted).]   At step three, the ALJ determined that plaintiff does not have an

impairment or a combination of impairments that meets or medically equals any of the impairments

---

[1]     The ALJ concluded that plaintiff met the insured status requirements of the Social
Security Act through December 31, 2014.  [AR at 21.]

1    in the Listings.  [Id. at 22.]  The ALJ further found that plaintiff retained the residual functional

2    capacity ("RFC")[2] to perform sedentary work as defined in 20 C.F.R. § 404.1567(a),[3] as follows:

3          [C]an lift and/or carry 10 pounds occasionally and 10 pounds frequently, can stand
           and/or walk six hours in an eight-hour day (with normal breaks), can sit six hours in
4          an eight-hour day (with normal breaks), must have the option to sit and/or stand
           (stand up momentarily after sitting), can frequently climb ramps and stairs, can
5          never climb ladders, ropes, or scaffolds, can frequently kneel, crouch, and crawl,
           can occasionally stoop, and is able to understand, remember, and carry out simple
6          instructions.

7    [Id.]  At step four, based on plaintiff's RFC and the testimony of the VE, the ALJ concluded that

8    plaintiff is unable to perform any of his past relevant work in the hybrid job of press operator and

9    folding machine worker.  [AR at 30, 74-76.]  At step five, based on plaintiff's RFC, vocational

10   factors, and the VE's testimony, the ALJ found that there are jobs existing in significant numbers

11   in the national economy that plaintiff can perform, including work as a "table worker" (Dictionary

12   of Occupational Titles ("DOT") No. 739.687-182), "touch up screener" (DOT No. 726.684-110),

13   and "wafer breaker, semiconductor" (DOT No. 726.687-046).  [AR at 31, 76-79.]  Accordingly, the

14   ALJ determined that plaintiff was not disabled at any time from the alleged onset date of March

15   27, 2010, through November 16, 2012, the date of the decision.  [AR at 32.]

16   /

17   /

18   /

19   /

20

21   ─────────────────

22      [2]    RFC is what a claimant can still do despite existing exertional and nonexertional
     limitations.  See Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989).  "Between steps
23   three and four of the five-step evaluation, the ALJ must proceed to an intermediate step in which
     the ALJ assesses the claimant's residual functional capacity."  Massachi v. Astrue, 486 F.3d 1149,
24   1151 n.2 (9th Cir. 2007) (citation omitted).

25      [3]    "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting
26   or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined
     as one which involves sitting, a certain amount of walking and standing is often necessary in
27   carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and
     other sedentary criteria are met."  20 C.F.R. § 404.1567(a).

28

# V.

## **THE ALJ'S DECISION**

Plaintiff contends that the ALJ erred when he:  (1) rejected the opinions of plaintiff's treating sources, Ben Shwachman, M.D., and Jimmy Yue, D.O., and examining physicians, Michael Tan, D.O., and A. Michael Moheimani, M.D.; and (2) rejected plaintiff's subjective symptom testimony. [Joint Stipulation ("JS") at 4.]

As set forth below, the Court agrees with plaintiff, in part, and remands for further proceedings.

## A.    TREATING PHYSICIAN

### 1.    **Legal Standard**

"There are three types of medical opinions in social security cases:  those from treating physicians, examining physicians, and non-examining physicians." Valentine v. Comm'r Soc. Sec. Admin., 574 F.3d 685, 692 (9th Cir. 2009); see also 20 C.F.R. §§ 404.1502, 404.1527.  "As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant."  Lester, 81 F.3d at 830; Garrison v. Colvin, 759 F.3d 995, 1012 (9th Cir. 2014) (citing Ryan, 528 F.3d at 1198; Turner v. Comm'r of Soc. Sec., 613 F.3d 1217, 1222 (9th Cir. 2010).  "The opinion of an examining physician is, in turn, entitled to greater weight than the opinion of a nonexamining physician."  Lester, 81 F.3d at 830; Ryan, 528 F.3d 1198.

"[T]he ALJ may only reject a treating or examining physician's uncontradicted medical opinion based on clear and convincing reasons."  Carmickle, 533 F.3d at 1164 (internal quotation marks and citation omitted); Widmark v. Barnhart, 454 F.3d 1063, 1066 (9th Cir. 2006).  "Where such an opinion is contradicted, however, it may be rejected for specific and legitimate reasons that are supported by substantial evidence in the record."  Carmickle, 533 F.3d at 1164 (internal quotation marks and citation omitted); Ryan, 528 F.3d at 1198; Ghanim v. Colvin, 763 F.3d 1154, 1160-61 (9th Cir. 2014); Garrison, 759 F.3d at 1012.  The ALJ can meet the requisite specific and

1    legitimate standard "by setting out a detailed and thorough summary of the facts and conflicting
2    clinical evidence, stating his interpretation thereof, and making findings."  Reddick, 157 F.3d at
3    725.  The ALJ "must set forth his own interpretations and explain why they, rather than the
4    [treating or examining] doctors', are correct."  Id.

5

6        **2.    Dr. Shwachman**

7        Dr. Shwachman, plaintiff's treating physician and a pain management specialist [see, e.g.,
8    AR at 558], saw plaintiff approximately ten times between May 2010 and October 2011 for his
9    complaints of elbow, knee, hand, and back pain.  [AR at 23, 362-68, 557-83.]  On June 3, 2010,
10   Dr. Shwachman diagnosed plaintiff with cervical spine syndrome with radiculopathy, internal
11   derangement of both elbows, internal derangement of the right knee, and possible rheumatoid
12   arthritis.[4]  [AR at 581-83.]  Dr. Shwachman requested cervical and caudal epidural steroid
13   injections, as well as chiropractic evaluation and treatment.  [AR at 583.]  He also recommended
14   an MRI of the cervical and lumbosacral spine, and of both elbows.  [Id.]

15       On October 11, 2012, Dr. Shwachman completed a Physical Residual Functional Capacity
16   Questionnaire.  [AR at 593-98.]  In that questionnaire, he opined that plaintiff could sit, stand, and
17   walk for about two hours during an eight-hour day; would need a job permitting shifting at will from
18   sitting, standing, or walking; would need to take unscheduled breaks every hour for twenty
19   minutes; could occasionally lift less than ten pounds; could occasionally reach, handle, finger, and
20   push/pull; would have good days and bad days; and would be absent from work more than four
21   days per month as a result of his impairments or treatment.  [Id.]  Dr. Shwachman stated that he
22   based his opinions on "imaging studies," but did not specify those studies.  [AR at 597.]

23       The ALJ gave "little weight" to the opinion of Dr. Shwachman as set forth in the Physical
24   Residual Functional Capacity Questionnaire because "it is not adequately substantiated by the
25   record":

26

27   ───────────────

28       [4]    Dr. Shwachman noted that plaintiff's "problem started when he suffered a work-related [left
     elbow] injury on 03/24/2010."  [AR at 581.]

7

In particular, Dr. Schwachman's [sic] restriction to less than a full day of work in terms of the claimant's standing/walking and sitting is not corroborated by the record. There is no evidence of surgery or more invasive procedures to address the claimant's ailments. Treatment has consisted of creams, patches, acupuncture, and medication. There is no evidence that the claimant requires in-home support services because of his physical conditions. Thus, Dr. Schwachman's [sic] extremely limiting restrictions are not compatible with the objective findings.

[AR at 26.]

### a.   Lack of Objective Findings

First, the ALJ specifically found that Dr. Shwachman's restriction to less than a full day of work in terms of standing/walking and sitting was not corroborated by the record. [Id.] However, as noted by plaintiff, Dr. Shwachman's restriction actually is corroborated in the record by the similar opinions of treating physician, Dr. Yue, and examining physician,[5] Dr. Tan. [JS at 9.] In fact, the ALJ also gave little weight to the opinions of Drs. Yue and Tan for the reason that they were "not consistent with," or did "not comport with," the other opinions in the record. [AR at 26, 27.] Given the fact that two treating physicians and one "examining" physician all found plaintiff could stand/walk and sit for less than an eight-hour workday, the ALJ's assertion that this opinion is not corroborated by the record, or by other opinions in the record, is unavailing.

Furthermore, Dr. Shwachman indicates in his report that he relied on imaging studies to arrive at his October 11, 2012, opinions. [AR at 597.] An October 8, 2012, MRI of the cervical spine showed multilevel degenerative disc disease, most significant at the C4-C5 through C6-C7 levels; mild to moderate left neural foraminal narrowing at the C5-C6 level; and chronic appearing anterior wedging deformity of the C5 vertebral body "resulting in between 25 and 50% anterior height loss."[6] [AR at 675-76.] A June 28, 2012, nerve conduction study of plaintiff's upper

---

[5]   According to plaintiff, Dr. Tan, who saw plaintiff only once, "acted as an examining physician in this case." [JS at 6 (citing AR at 599-604, 680); see also Discussion infra Part V.A.4.]

[6]   A June 9, 2010, cervical MRI showed 1-2 mm posterior disc bulge at C4-C5 with corresponding indentation on the anterior aspect of the subarachnoid space; a 3 mm posterior disc bulge at C5-C6, with the left side greater than the right, a corresponding indentation of the subarachnoid space, and narrowing of both spina foramina; and a 2 mm posterior disc bulge at C6-C7, with corresponding indentation on the anterior aspect of the subarachnoid space, and
(continued...)

1   extremities resulted in an "[a]bnormal [nerve conduction study] with findings of mild left Ulnar

2   neuropathy across the elbow." [AR at 672.] During his examination, Dr. Shwachman also

3   assessed plaintiff's cervical range of motion to be significantly limited with pain at the end limit, and

4   noted that he had bilateral positive straight leg raising. [AR at 594.] Thus, there is objective

5   evidence in the record that may support Dr. Shwachman's opinion.[7]

6         Accordingly, the ALJ's finding that Dr. Shwachman's restriction to less than a full day of

7   work in terms of standing/walking and sitting as not corroborated by the record, is not a specific

8   and legitimate reason for giving Dr. Shwachman's opinion little weight. Nor, for the same reasons,

9   is it a valid reason for giving little weight to the similar opinions of Dr. Yue and Dr. Tan.[8]

10        Dr. Shwachman also found plaintiff would need a sit/stand option, hourly breaks, and was

11  restricted to lifting under ten pounds. [AR at 596.] Although the ALJ does not specifically mention

12  that these other limitations are uncorroborated (as he did with the restriction to less than a full day

13  of sitting/standing/walking), a review of the record shows corroboration. For instance, Dr. Yue also

14  opined that plaintiff was limited to lifting under ten pounds [AR at 412], and Dr. Tan opined that

15  plaintiff could frequently lift less than ten pounds, and occasionally lift ten pounds. [AR at 602.]

16  With regard to a sit/stand option, Dr. Yue also indicated plaintiff would need to get up from sitting

17  every thirty minutes [AR at 413], and Dr. Tan indicated plaintiff would need to walk for five minutes

18  every sixty to ninety minutes. [AR at 602.]

19        Accordingly, to the extent the ALJ found that Dr. Shwachman's restrictions to a sit/stand

20  option, frequent breaks, and lifting under ten pounds were not corroborated by the record, this was

21  _____

22        [6](...continued)
    narrowing of both spina foramina. [AR at 329.] A June 9, 2010, lumbar MRI showed a 2-3 mm
23  posterior disc bulge at L4-L5, with corresponding indentation on the anterior aspect of the
    subarachnoid space, and mild spinal stenosis; and a 2-3 mm posterior disc bulge at L5-S1 with
24  corresponding indentation of the epidural fat. [AR at 330.]

25        [7]   Which imaging studies Dr. Shwachman actually relied on, and/or which imaging studies in
26  the record support or refute Dr. Shwachman's opinion, are issues that may need to be further
    developed on remand.

27
28        [8]   The ALJ's other reasons for giving little weight to the opinions of Dr. Yue and Dr. Tan are
    discussed infra, Parts V.A.3 & 4.

9

1  not a specific and legitimate reason supported by substantial evidence for giving those opinions

2  little weight.

3

4           **b.    Conservative Treatment**

5           The ALJ also gave little weight to Dr. Shwachman's opinions because there was no

6  evidence of "surgery or more invasive procedures" to address plaintiff's ailments; treatment has

7  consisted of creams, patches, acupuncture, and medication; and there is no evidence that plaintiff

8  requires in-home support services because of his physical conditions.  [AR at 26.]  Thus, the ALJ

9  appears to be contending that plaintiff has received only conservative treatment.

10          Plaintiff argues that "physical therapy, potent medications, and steroid injections," are hardly

11 evidence of conservative treatment.  [JS at 10.]  "Conservative treatment" has been characterized

12 by the Ninth Circuit as, for example, "treat[ment] with an *over-the-counter pain medication*" (see,

13 e.g., Parra v. Astrue, 481 F.3d 742, 751 (9th Cir. 2007) (emphasis added); Tommasetti v. Astrue,

14 533 F.3d 1035, 1040 (9th Cir. 2008) (holding that ALJ properly considered the plaintiff's use of

15 "conservative treatment including physical therapy and the use of anti-inflammatory medication,

16 a transcutaneous electrical nerve stimulation unit, and a lumbosacral corset")), or a physician's

17 failure "to prescribe . . . any serious medical treatment for [a claimant's] supposedly excruciating

18 pain."  Meanel v. Apfel, 172 F.3d 1111, 1114 (9th Cir.1999).

19

20          **i.    Epidural Injections**

21          Plaintiff's treatment has consisted of treatment by a pain management specialist,

22 prescription pain medication to control plaintiff's pain, physical therapy, acupuncture, electrical

23 stimulation, chiropractic treatment, and recommendations for cervical and lumbar epidural

24 injections.  At issue is whether plaintiff's treatment regimen, and specifically the recommended

25 spinal epidural injections, constitute "conservative treatment."  This Court has previously found that

26 spinal epidural injections are not "conservative" treatment.  See, e.g., Harvey v. Colvin, 2014 WL

27 3845088, at *9 (C.D. Cal. Aug. 5, 2014) (injections to the cervical region consisting of stellate

28 ganglion blocks that were not entirely effective did not support ALJ's reliance on conservative

1   treatment to support an adverse credibility finding) (citing <u>Yang v. Barnhart</u>, 2006 WL 3694857,

2   at *4 (C.D. Cal. Dec.12, 2006) (ALJ's finding that claimant received conservative treatment was

3   not supported by substantial evidence when claimant underwent physical therapy and epidural

4   injections, and was treated with several pain medications)); <u>see</u> <u>Miller v. Astrue</u>, 2009 WL 800227,

5   at *3 (E.D. Cal. Mar. 25, 2009) (ALJ's finding that claimant was not credible properly considered

6   "the conservative nature of [claimant's] treatment" since claimant "was not a surgical candidate,

7   did not use a TENS unit, had not undergone epidural steroid injections and only intermittently took

8   pain medications"); <u>but</u> <u>see</u> JS at 22-23 (citing cases).[9]

9      In this case, although lumbar and cervical epidural treatments have been recommended

10  and possibly requested for plaintiff's back and neck pain [AR at 388, 583, 607], plaintiff apparently

11  never has received those injections.  [<u>See</u> AR at 623; <u>but</u> <u>see</u> AR at 370 (on January 18, 2011,

12  plaintiff reported to Dr. Moheimani that he "has had two injections").[10]]  The Court was not able to

13  find evidence in the record as to why plaintiff has not received lumbar epidural injections despite

14  Dr. Shwachman's request and Dr. Moheimani's recommendations.[11]  [<u>See</u>, <u>e.g.</u>, AR at 388, 538,

15  638.]  There is some evidence to suggest that plaintiff is waiting for authorizations to go forward

16

17

18     [9]  Most of the Commissioner's cited cases are out of district cases and, therefore, not binding on
this Court. [JS at 22-23.]  Moreover, the Court is not persuaded by the Commissioner's conclusion

19  that the case of <u>Jevne v. Colvin</u> clearly stands for the proposition that "plaintiff's epidural injections
were 'conservative' treatment.'" [JS at 22 (citing <u>Jevne</u>, 2014 WL 4829076, at *5 (C.D. Cal. Sept. 26,

20  2014).]  In considering whether the ALJ properly discredited plaintiff's subjective symptom testimony
due to the absence of supporting objective medical evidence, the court in <u>Jevne</u> specifically stated that

21  "plaintiff was *conservatively* treated *with only pain medication and muscle relaxers.*"  <u>Jevne</u>, 2014 WL
4829076, at *5 (emphasis added).  The court then discussed the fact that plaintiff had *also* received

22  several epidural injections, demonstrating that his impairment can be controlled effectively with
medication.  <u>Id.</u> (citing <u>Warre v. Comm'r of Soc. Sec. Admin.</u>, 439 F.3d 1001, 1006 (9th Cir. 2006) for

23  the proposition that "impairments that can be controlled with medication are not disabling for the
purpose of determining eligibility for SSI benefits.").  The <u>Jevne</u> court then *analogized* the plaintiff's

24  positive response to the epidural injections by citing to the holding in <u>Tommasetti</u> that "evidence that
claimant 'responded favorably to conservative treatment' undermines plaintiff's reports of disabling

25  pain."  <u>Id.</u>

26

27    [10]  The Court finds no evidence in the record of injections prior to January 18, 2011.

28    [11]  There is no evidence that plaintiff has refused to undergo lumbar injections.

1    with the cervical epidural treatments.[12] In any event, the relevant fact for purposes of this analysis

2    is that epidural injections have been recommended by plaintiff's medical sources to help control

3    plaintiff's pain.  See Meanel, 172 F.3d at 1114 (that a physician has *failed* "to prescribe . . . any

4    serious medical treatment for [a claimant's] supposedly excruciating pain" may be evidence of

5    conservative treatment).

6

7                        **ii.    In-Home Support Services**

8           The ALJ also rejected Dr. Shwachman's opinion because there was no evidence that

9    plaintiff "requires in-home support services because of his physical conditions."[13]  [AR at 26.]

10   However, there is no evidence that any doctor suggested that such services are warranted.  Nor

11   are such services required for a finding of disability.  In fact, the Ninth Circuit has made it clear that

12   a claimant need not be "utterly incapacitated to be eligible for benefits . . . ."  Fair v. Bowen, 885

13   F.2d 597, 603 (9th Cir. 1989) (internal citations omitted).

14

15                       **iii.    Surgery or "More Invasive Procedures"**

16          The ALJ also noted that "[t]here is no evidence of surgery or more invasive procedures to

17   address" plaintiff's ailments.  [AR at 26.]  That plaintiff has not had surgery is essentially a non

18   sequitur because there is no evidence in the record that surgery has been recommended for

19   plaintiff or even would be a viable treatment for his ailments.  In fact, plaintiff stated at the hearing

20   that he has not had a surgical consultation for his back pain because the doctors "say no" [AR at

21   57], and that he has not had any surgical procedures done for his knee complaints because the

22

23   ────────────────

24        [12]  Plaintiff reported to Dr. Goalwin that he was "waiting for a referral to receive epidural
     injections to his neck," and that a request for a cortisone injection for his left elbow pain was
25   denied by the insurance company.  [AR at 607.]

26        [13]  In-Home Support Services is a state-funded program administered by counties that
     provides assistance to aged, blind, and disabled individuals so they can safely remain in their
27   homes.   In-Home Support Services Program, California Department of Social Services,
     http://www.cdss.ca.gov/agedblinddisabled/pg1296.htm (last visited January 20, 2015).
28

doctors "cannot find any damage inside," seeming to indicate that plaintiff has been told he is not a candidate for surgery for these impairments.  [AR at 62-63.]

Additionally, the ALJ failed to point to anything in the record to show that any specific surgical or "more invasive" procedures in addition to the treatment plaintiff was receiving (e.g., treatment by a pain management specialist, prescription pain medication to control plaintiff's pain, physical therapy, acupuncture, electrical stimulation, chiropractic treatment), or had been recommended to receive (e.g., spinal epidural injections, cortisone injections), is a standard method for treating individuals with the type of pain caused by plaintiff's physical impairments. Again, plaintiff need not be "utterly incapacitated" to be disabled.  Fair, 885 F.2d at 603. Accordingly, this was not a specific and legitimate reason for discounting Dr. Shwachman's opinion.

Based on the foregoing, there is corroboration in the record to support Dr. Shwachman's opinions and the ALJ's reasons for giving Dr. Shwachman's opinions little weight are not specific and legitimate, or supported by substantial evidence.  Remand is warranted.

### 3.    Dr. Yue

On March 28, 2010, plaintiff's treating physician, Dr. Yue, diagnosed plaintiff with left elbow tendonitis, and stated that plaintiff should avoid repetitive movements and not lift more than five pounds. [AR at 404.] His treatment plan included steroid injections [but see supra note 12] and medications. [Id.] Dr. Yue stated that plaintiff would be able to return to work in three weeks. [Id.] On April 9, 2010, Dr. Yue indicated plaintiff was still "suffering from severe [bilateral] elbow pain" and would be off work for another three weeks. [AR at 405.]

The ALJ gave "little weight" to Dr. Yue's April 2010 opinion because it was rendered shortly after plaintiff's work injury, and "does not pertain to [plaintiff's] overall functional abilities after extensive treatment." [AR at 27.]  The Court finds this to be a specific and legitimate reason to discount Dr. Yue's April 2010 opinion.

/

13

On May 25, 2011, Dr. Yue completed a Medical Source Statement - Physical. [AR at 412-13.]  Dr. Yue found that due to plaintiff's decreased mobility, decreased range of motion, and tenderness on palpation to both elbows, his maximum capacity to lift and/or carry was less than ten pounds. [AR at 412.]  He also stated that plaintiff could stand and/or walk less than two hours in an eight hour work day due to lower back pain and decreased sensation in both lower extremities, and could sit less than six hours of an eight-hour workday because he needs to get up every thirty minutes. [AR at 412-13.]  He described plaintiff's prognosis as "fair." [AR at 413.]

The ALJ gave "little weight" to Dr. Yue's May 2011 opinion because

> it relies heavily on the claimant's subjective complaints and does not comport with the other opinions in the record and the medical record as a whole. In particular, Dr. Yue's restriction to less than a full day of work in terms of the claimant's standing/walking and sitting is not corroborated by the record, especially in light of his range of activities of daily living.

[AR at 27 (citations omitted).]

In discussing the ALJ's rejection of Dr. Shwachman's opinions, the Court previously rejected the ALJ's reasoning that a restriction to less than a full day of work in terms of standing/walking and sitting does not comport with other opinions in the record, or with the record as a whole.  [See Discussion supra Part V.A.2.]

With respect to Dr. Yue's opinion, however, the ALJ also added that the lack of corroboration for Dr. Yue's similar restriction is especially true "in light of [plaintiff's] range of activities of daily living."[14]  [AR at 27.]  While an inconsistency between a treating physician's opinion and a claimant's daily activities may be a specific and legitimate reason to discount a treating physician's opinion, this is not true when a "holistic review of the record does not reveal an inconsistency between the treating providers' opinions and [the claimant's] daily activities." Ghanim, 763 F.3d at 1162.

Here, the ALJ describes plaintiff's "fairly normal" "range" of daily activities as talking to his wife on the telephone; walking with his wife; supervising his daughter; doing activities with his

---

[14]   The ALJ does not proffer this reason for discounting the similar opinions of Dr. Shwachman or Dr. Tan.

daughter both indoors and outdoors; going to dinner with his wife "at times"; attending family functions; driving; attending to personal care independently; and cleaning the table. [AR at 29-30 (citations omitted).] A review of the record, however, fails to show how these limited activities are inconsistent with Dr. Yue's restriction to less than a full day of work in terms of standing/walking and sitting.

For instance, plaintiff does not walk with his wife daily or for long periods of time -- he reported to Qualified [Psychiatric] Medical Examiner Stanley L. Goodman, M.D., that he takes these walks "two or three times per week for 20 minutes" [AR at 649]; in April 2012, when plaintiff reported that he supervised his daughter and did activities with her, plaintiff's daughter was twelve-years old [AR at 650], and there is no indication that plaintiff was doing activities with his daughter for eight hours at a time or that they were particularly strenuous activities [AR at 649]; although plaintiff also reported going to dinner with his wife "at times," and attending family functions, there is no indication how often these events occur or for how long they last [id.]; the "driving" the ALJ referred to [AR at 30 (citing AR at 471)] is based on a mention in the report of consultative internal medicine examiner Dr. Lim, who stated only that plaintiff drove himself to the clinic for his August 3, 2011, examination [AR at 471] -- at the hearing, plaintiff testified he tries not to drive because he is not used to it [AR at 68], and when he does drive it is only close to the house [AR at 71-72]. Similarly, the Court is hard-pressed to see how plaintiff's ability to eat, dress, and bathe himself,[15] and clean the table, in any way detract from Dr. Yue's opinion.

In short, there is no evidence that plaintiff's talking on the telephone, driving himself to one doctor's appointment, taking short walks a few times a week, cleaning the table, or the other cited activities -- many of which are not occurring daily, and none of which appears to be of extended duration -- are inconsistent with Dr. Yue's finding that plaintiff is unable to perform sustained work activity for an eight-hour day.

/

---

[15] Plaintiff testified at the hearing that he sometimes has difficulty with showering and dressing [AR at 69], and that he is able to boil water for cooking. [AR at 70.]

15

Based on the foregoing, this was not a specific and legitimate reason supported by substantial evidence for giving Dr. Yue's opinion "little weight."

### 4. Dr. Tan

Dr. Tan saw plaintiff on October 5, 2012, and completed a Physical Residual Functional Capacity Questionnaire on October 15, 2012. [AR at 599-604.]  He diagnosed numbness, weakness, hand/arm pain, and neck pain, and indicated plaintiff's prognosis was "stable." [AR at 599.]  He opined plaintiff could sit more than two hours at one time before needing to get up, and could stand for two hours at one time before needing to sit down or walk around.  [AR at 601.]  He also stated that plaintiff could sit about four hours of an eight-hour workday and stand/walk about two hours of an eight-hour workday.  [Id.]  He opined that plaintiff would need to walk around for five minutes every sixty to ninety minutes during the day [AR at 602], and that he would need to take two to three five-minute breaks during an eight-hour day, but that he did not need a job that would permit shifting positions at will.  [Id.]  Dr. Tan also opined that plaintiff could frequently lift less than ten pounds; occasionally lift ten pounds; and rarely lift twenty pounds [id.]; and could only occasionally bilaterally reach, handle, finger, feel, and push/pull.  [AR at 603.]  Dr. Tan also specifically found that plaintiff did *not* have significant limitation of motion in his cervical spine.  [AR at 600.]  Dr. Tan stated that his findings were based on plaintiff's right hand numbness, bilateral arm and hand pain, and neck pain, which he attributed to repetitive use of hands and arms.  [Id.]  Dr. Tan also opined that the *earliest* date that the description of symptoms and limitations applied was October 5, 2012 [AR at 604], and that plaintiff's impairments had not lasted or cannot be expect to last for at least twelve months.  [AR at 599.]

The ALJ gave "little weight" to Dr. Tan's opinion as not consistent with the other opinions in the record and the medical record as a whole.  [AR at 26.]  He also stated as follows:

> In particular, Dr. Tan's restriction to less than a full day of work in terms of [plaintiff's] standing/walking and sitting is not corroborated by the record.  Moreover, Dr. Tan rendered his opinion after seeing [plaintiff] once.  Thus, Dr. Tan does not have a significant longitudinal treatment relationship with [plaintiff].  Moreover, Dr. Tan primarily diagnosis symptoms [sic].

[AR at 26-27.]

Preliminarily, according to plaintiff, Dr. Tan "acted as an examining physician in this case." [JS at 6 (citing AR at 599-604, 680).]  Therefore, plaintiff does not claim that Dr. Tan is a treating physician whose opinion is entitled to any special weight.  However, the Court finds plaintiff's characterization of Dr. Tan as an examining physician to be suspect as there is no evidence that Dr. Tan reviewed any of plaintiff's previous medical records, did any independent testing, or did anything except prepare the Physical Residual Functional Capacity Questionnaire based on plaintiff's subjective complaints.  The form itself indicates that "all relevant treatment notes, radiologist reports, laboratory and test results that have not been provided previously to the Social Security Administration" should be attached.  [AR at 599.]  Yet, there is nothing attached and nothing to indicate that Dr. Tan actually examined plaintiff.  Some of Dr. Tan's conclusions are inconsistent with the opinions of Dr. Yue and Dr. Shwachman who actually found plaintiff *more* limited.

With regard to the ALJ's discounting of Dr. Tan's opinions, the Court previously rejected the ALJ's reasoning that the restriction to less than a full day of work in terms of standing/walking and sitting does not comport with other opinions in the record, or with the record as a whole, as Dr. Shwachman, Dr. Yue, and Dr. Tan all found this restriction.  [See Discussion supra Part V.A.2.] Thus, this was not a specific and legitimate reason for discounting Dr. Tan's opinions.

However, the fact that Dr. Tan saw plaintiff only once -- apparently for no other purpose than to complete a Physical Residual Functional Capacity Questionnaire -- is a specific and legitimate reason to discount Dr. Tan's opinions.  Sprague v. Bowen, 812 F.2d 1226, 1230 (9th Cir. 1987) (treating physician's opinion given greater credence than examining physician's opinion, because, unlike one-time examination, it is based on in-depth view and observation over time); 20 C.F.R. § 404.1527(d)(2).  This is especially true as Dr. Tan apparently relied on plaintiff's subjective complaints rather than any objective findings.  Thus, to the extent the ALJ discounted Dr. Tan's opinion for this reason, this finding also is supported by substantial evidence as there is no evidence in Dr. Tan's report that he did any independent testing, or even reviewed medical

records.  [AR at 599-604]; Ghanim, 763 F.3d at 1162 (if treating provider's opinions based "to a large extent" on self-reports and not on clinical evidence, and the ALJ finds the claimant not credible, the ALJ may discount the treating provider's opinion).

Based on the foregoing, the ALJ did not err in discounting Dr. Tan's opinions.

### 5.    Dr. Moheimani

Dr. Moheimani, an orthopedic surgeon and Agreed Medical Examiner, first examined plaintiff in the context of his workers' compensation claim in January 2011.  [AR at 369-89.]  Dr. Moheimani observed that plaintiff walked with a mild limp, had difficulty with toe and heel walking, and was able to nearly fully squat.  [AR at 376.]  He diagnosed plaintiff with cervical and lumbar strain with radicular complaints, bilateral elbow tendonitis, right knee strain, right corneal abrasion, and complaints of depression, anxiety, and sleep disorder.  [AR at 386.]  He opined that plaintiff's "restriction would be no pushing, pulling, or lifting more than 10 pounds with the ability to sit or stand as needed to alleviate his back pain."  [AR at 388.]  He stated that plaintiff might benefit from a cervical epidural injection and, if plaintiff notes improvement, then up to three cervical epidurals would be appropriate.  [Id.]

In March 2012, Dr. Moheimani prepared a follow-up Agreed Medical Evaluation.  [AR at 622-40.]  After examining plaintiff and reviewing the medical records, he diagnosed plaintiff with cervical spine strain with radicular complaints with MRI evidence of disc bulging at C5-C6 and C6-C7 minimally with bilateral neuroforaminal stenosis; lumbar strain with radicular complaints with MRI evidence of disc bulges at  L4-L5, L5-S1 with mild spinal stenosis at L4-L5; bilateral elbow tendonitis; bilateral medial elbow epicondylitis; right knee degeneration of the medial meniscus with bursitis; right eye corneal abrasion; complaints of depression, anxiety, and sleep disorder; and complaints of bilateral wrist pain.  [AR at 636.]  He opined that plaintiff was permanent and stationary[16] as of March 20, 2012.  [AR at 637.]  He again noted that plaintiff's "restrictions would

---

[16]    Under workers' compensation law, "permanent and stationary" is "when the employee has reached maximal medical improvement, meaning his or her condition is well stabilized, and unlikely

(continued...)

be no pushing, pulling, or lifting more than 10 pounds with a capability to sit and stand as needed

to alleviate his pain."  [Id.]  He noted that he had previously recommended up to three cervical

epidural injections but that plaintiff had not undergone any at that time.   [Id.]   He also

recommended an epidural injection for plaintiff's lumbar spine, and up to three total injections if

plaintiff notes improvement.  [AR at 638.]

The ALJ gave Dr. Moheimani's two opinions the "greatest weight" because they were

"based on thorough reviews of the record, detailed examinations, and cogent explanations of his

rationale."  [AR at 26.]  The ALJ also stated:

> [Dr. Moheimani's] status as an Agreed Medical Examiner makes his opinion
> particularly persuasive as both parties to the workers' compensation litigation agreed
> that he would render a neutral and unbiased opinion.  In addition, Dr. Moheimani's
> opinion incorporates subjective complaints as outside of range of motion deficits and
> isolated tenderness, his examination of the claimant was largely normal, showing
> no atrophy, motor, sensory or reflex deficits, swelling, instability, weakness, gait
> abnormality or positive straight leg raises.  Special tests for the shoulders and knees
> were negative.  Grip strength was zero kilograms bilaterally on all three attempts,
> but there is nothing in Dr. Moheimani's examination report that would provide an
> objective medical explanation for the claimant's apparent inability to grip 2.2 lbs.[17]
> Examination of the hands and wrists was normal.  As with range of motion tests,
> squeezing a Jamar grip strength device is dependent on the individual[']s effort.  In
> sum, from an objective medical standpoint, Dr. Moheimani's examination findings
> did not differ in large respect from the consultative examination by the Social
> Security designated doctor [Seung Ha Lim, M.D.].[18]

[Id. (citations omitted).]

Plaintiff argues that the ALJ mischaracterized Dr. Moheimani's opinion regarding plaintiff's

ability to lift, push, and pull.  [JS at 8-9.]  He claims that the ALJ stated the following:  "Dr.

Moheimani opined that [plaintiff] *could* lift, *push, pull*, 10 pounds . . . ," and argues that "Dr.

---

[16](...continued)
to change substantially in the next year with or without medical treatment."  Cal. Admin. Code §
9785(a)(8).

[17]    The Court notes that this test result might provide support for plaintiff's argument that Dr.
Moheimani intended to preclude plaintiff from pushing and pulling.  Dr. Moheimani himself does
not comment on plaintiff's Jamar test results, which on January 18, 2011, showed grip strength
results of 34, 22, and 12 for the right hand, and 8, 6, and 4, for the left hand.  [AR at 373.]

[18]    Dr. Lim imposed no physical limitations and the ALJ gave her opinion little weight because the
objective findings show that plaintiff "does have some physical limitations."  [AR at 25, 26.]

1    Moheimani actually opined [plaintiff] could *not* push, pull, *or* lift more than 10 pounds." [Id. at 8

2    (citing id. at 24-25, 388).]  He argues, therefore, that rather than finding that plaintiff could push,

3    pull, or lift all within the ten pound limit, Dr. Moheimani actually restricted plaintiff to a "no push/pull

4    limitation." [JS at 9.]  Plaintiff argues that a no push/pull limitation would preclude all of the jobs

5    identified by the VE because according to the DOT, each job requires "the ability to lift, carry,

6    *push, pull*, or otherwise move objects, including the human body." [Id. (citations omitted).]"

7            The Court agrees that there may be more than one way to interpret Dr. Moheimani's

8    statement that "[plaintiff's] restriction would be no pushing, pulling, or lifting more than 10 pounds

9    . . . ." [AR at 388, 637.]  For instance, Dr. Moheimani's statement could be read to mean that

10   plaintiff is restricted to no pushing more than 10 pounds, no pulling more than 10 pounds, or no

11   lifting more than 10 pounds; alternatively, the statement could be read as plaintiff suggests, to

12   mean no pushing or pulling at all, and lifting no more than 10 pounds, which might affect the RFC

13   and/or the VE's testimony about available positions.

14           Because the case is being remanded for reconsideration of the weight to be given the

15   opinions of the treating physicians, Dr. Shwachman and Dr. Yue, the ALJ should also clarify Dr.

16   Moheimani's pushing/pulling/lifting restriction(s) and any effect those restrictions might have on

17   the ALJ's RFC and the step five determination.

18

19   **B.     CREDIBILITY**

20           Plaintiff contends the ALJ failed to articulate legally sufficient reasons for rejecting plaintiff's

21   subjective symptom testimony. [JS at 32.]

22           "To determine whether a claimant's testimony regarding subjective pain or symptoms is

23   credible, an ALJ must engage in a two-step analysis." Lingenfelter v. Astrue, 504 F.3d 1028,

24   1035-36 (9th Cir. 2007).  "First, the ALJ must determine whether the claimant has presented

25   objective medical evidence of an underlying impairment 'which could reasonably be expected to

26   produce the pain or other symptoms alleged.'" Id. at 1036 (quoting Bunnell v. Sullivan, 947 F.2d

27   341, 344 (9th Cir. 1991) (en banc)).  Second, if the claimant meets the first test, the ALJ may

28

1  reject the claimant's testimony about the severity of his symptoms "only upon (1) finding evidence

2  of malingering, or (2) expressing clear and convincing reasons for doing so." Benton v. Barnhart,

3  331 F.3d 1030, 1040 (9th Cir. 2003).  Factors to be considered in weighing a claimant's credibility

4  include:  (1) the claimant's reputation for truthfulness; (2) inconsistencies either in the claimant's

5  testimony or between the claimant's testimony and his conduct; (3) the claimant's daily activities;

6  (4) the claimant's work record; and (5) testimony from physicians and third parties concerning the

7  nature, severity, and effect of the symptoms of which the claimant complains.  See Thomas v.

8  Barnhart, 278 F.3d 947, 958-59 (9th Cir. 2002); see also Ghanim, 763 F.3d at 1163; 20 C.F.R. §§

9  404.1529(c), 416.929(c).

10       Where, as here, plaintiff has presented evidence of an underlying impairment, and the ALJ

11  did not find "affirmative evidence" of malingering[19] [see, generally, AR at 29-30], the ALJ's reasons

12  for rejecting a claimant's credibility must be specific, clear and convincing.  Burrell v. Colvin, __

13  F.3d __, 2014 WL 7398892, at *2 (9th Cir. Dec. 31, 2014) (citing Molina v. Astrue, 674 F.3d 1104,

14  1112 (9th Cir. 2012)).  "General findings [regarding a claimant's credibility] are insufficient; rather,

15  the ALJ must identify what testimony is not credible and what evidence undermines the claimant's

16  complaints." Id. at *4 (quoting Lester, 81 F.3d at 834) (internal quotation marks omitted).  The

17  ALJ's findings "must be sufficiently specific to allow a reviewing court to conclude the adjudicator

18  rejected the claimant's testimony on permissible grounds and did not arbitrarily discredit a

19  claimant's testimony regarding pain." Bunnell, 947 F.2d at 345-46 (internal quotation marks and

20  citation omitted).  A "reviewing court should not be forced to speculate as to the grounds for an

21  adjudicator's rejection of a claimant's allegations of disabling pain." Id. at 346.  As such, an

22  "implicit" finding that a plaintiff's testimony is not credible is insufficient.  Albalos v. Sullivan, 907

23  F.2d 871, 874 (9th Cir. 1990) (per curiam).

24

25

---

26       [19]  The ALJ did note one consulting examiner's finding that plaintiff's scores indicated the
   possibility of some symptom exaggeration.  [AR at 30.]  The ALJ never makes an overt finding of
27  malingering, however; nor does the Commissioner make such an argument.  [See JS at 37 (noting
   that although the ALJ found evidence of symptom exaggeration, the ALJ did not find overt
28  malingering).]

Here, the ALJ found plaintiff's "credibility is at variance with the weight of the evidence" for the following reasons:

He has a good work history, appeared sincere and may very well have developed overuse symptoms in his arm and other parts of his body. Nevertheless, his complaints of symptoms that were so severe as to prevent him from working are not fully credible. Clinical signs at the internal medicine consultative examination [of Dr. Lim] reflect virtually no abnormalities as is largely the case with the aforementioned agreed upon examination done by Dr. Moheimani, who expressed the opinion that the claimant can perform a range of sedentary work. The claimant's conservative treatment with creams, patches, acupuncture, and medication and the absence of any surgery or more invasive procedures tend to demonstrate that the claimant's conditions are not as serious as he alleges. The claimant's fairly normal activities of daily living such as talking to his wife on the telephone, walking with his wife, supervising his daughter, doing activities with his daughter both indoors and outdoors, going to dinner with his wife at times, attending family functions, driving, attending to personal care independently, and cleaning the table, are not indicative of debility. Moreover, Dr. Goodman noted that the claimant's elevated score on Scale F indicated the possibility of some symptom enhancement in order to draw attention to his emotional and physical plight. Dr. Goodman concluded that the claimant had some evidence of symptom enhancement and defensiveness. Moreover, the claimant's mental treatment is not as frequent as expected given his subjective complaints of debilitating depression.

I noticed at the hearing that the claimant periodically got up as if he needed to change positions but would do so very quicky, sitting down after a second or so. This very rapid movement of standing up and quickly sitting down does not appear not consistent [sic] with his allegations. Although he gave low back pain, neck pain, left elbow pain, and wrist pain as the primary basis of disability, he endorsed having serious problems everywhere pointed out to him, including the eyes, which is not borne by the evidence to a significant degree. The claimant[']s eye condition happened years following which time he worked. He sees well and outside of the ophthalmological exam does not complain of significant eye problems to his doctor. His description of activities of daily living at the hearing was more restrictive than what he reported at Exhibits 3E, 26F, 27F and 40F. For instance, the claimant stated that he had difficulty with walking for "more than two hours" in January 2011 to Dr. Moheimani; however, he testified that he could only walk one to two blocks. Again, the claimant's zero grip strength in his left and right upper extremities is suspicious in light of the minimal objective findings. Frankly, it suggest[s] poor effort. In light of all of the foregoing, I do not find that the claimant's subjective complaints are fully reliable.

[AR at 29-30 (citations omitted).]

For the same reasons discussed above relating to the ALJ's discounting of the treating physicians' opinions, to the extent the ALJ based his credibility determination on plaintiff's "conservative treatment" and "activities of daily living," these also are not specific, clear and convincing reasons to discount plaintiff's subjective complaints.

However, the ALJ also found that not only did one of the medical consultants find signs of symptom exaggeration during testing, but plaintiff also showed such signs at the hearing, including changing positions in a manner inconsistent with his allegations, and alleging serious problems "everywhere pointed out to him," including endorsing an eye problem based on an incident that occurred many years earlier, and with which he continued to work for many years.  [AR at 30.] The ALJ also stated that symptom exaggeration could be seen in strength test results where plaintiff was found to have "zero grip strength" in both upper extremities.  [Id.; see also supra note 17.]   This was a specific, clear, and convincing reason for discounting plaintiff's subjective complaints.  Tonapetyan v. Halter, 242 F.3d 1144, 1148 (9th Cir. 2001) (ALJ properly found that the claimant's "tendency to exaggerate" was a factor supporting his determination that she was not credible).  Finally, the ALJ also noted inconsistencies between statements plaintiff made to his doctors, and statements he made at the hearing.  This also is a valid reason to discount subjective symptom testimony.  Thomas, 278 F.3d at 958-59.

Even assuming the ALJ erroneously relied on plaintiff's conservative treatment and activities of daily living to discredit plaintiff, the ALJ's credibility determination must still be upheld if he also provided valid reasons supported by the record that constitute substantial evidence. Molina, 674 F.3d at 1115.  In this case, as discussed above, the ALJ also relied on plaintiff's symptom exaggeration and inconsistencies in plaintiff's statements to discredit plaintiff's complaints.  Thus, substantial evidence supports the ALJ's credibility finding and any error was harmless.  See Bray v. Comm'r of Soc. Sec. Admin., 554 F.3d 1219, 1227 (9th Cir. 2009) (any error was harmless even if record did not support one of four reasons for discounting claimant's testimony) (citation omitted).

# VI.

## REMAND FOR FURTHER PROCEEDINGS

The Court has discretion to remand or reverse and award benefits.  McAllister v. Sullivan, 888 F.2d 599, 603 (9th Cir. 1989).  Where (1) the record has been fully developed and further

administrative proceedings would serve no useful purpose; (2) the ALJ failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand, it is appropriate to exercise this discretion to direct an immediate award of benefits. Garrison, 759 F.3d at 1020 (setting forth the three-part credit-as-true standard for exercising the Court's discretion to remand with instructions to calculate and award benefits); see also Lingenfelter, 504 F.3d at 1041; Benecke v. Barnhart, 379 F.3d 587, 595-96 (9th Cir. 2004).  Where there are outstanding issues that must be resolved before a determination can be made, and it is not clear from the record that the ALJ would be required to find plaintiff disabled if all the evidence were properly evaluated, remand is appropriate. See Benecke, 379 F.3d at 593-96; see also Connett v. Barnhart, 340 F.3d 871 (9th Cir. 2003) (cautioning that the credit-as-true rule may not be dispositive of the remand question in all cases, even where all three conditions are met).  In Garrison, the Ninth Circuit, noting that it had never exercised the flexibility set forth in Connett in a published decision, clarified that the nature of that flexibility is "properly understood as requiring courts to remand for further proceedings when, even though all conditions of the credit-as-true rule are satisfied, an evaluation of the record as a whole creates serious doubt that a claimant is, in fact, disabled." Garrison, 759 F.3d at 1020-21.

In this case, under Connett, the Court finds that remand for further proceedings is appropriate because, as discussed above, the ALJ failed to provide legally sufficient reasons for rejecting or discrediting medical opinion evidence, and an evaluation of the record as a whole creates serious doubt that plaintiff is, in fact, disabled.

In an effort to expedite these proceedings and to avoid any confusion or misunderstanding as to what the Court intends, the Court will set forth the scope of the remand proceedings.  First, because the ALJ failed to provide specific and legitimate reasons for discounting the opinions of Dr. Shwachman and Dr. Yue, the ALJ on remand shall reassess the opinions of these physicians. Second, the ALJ shall also clarify the pushing/pulling/lifting restrictions of Dr. Moheimani.  In assessing the medical opinion evidence of all of these doctors, the ALJ must explain the weight

afforded to each opinion and provide legally adequate reasons for any portion of the opinion that the ALJ discounts or rejects, including a legally sufficient explanation for crediting one doctor's opinion over any of the others.  Finally, the ALJ shall reassess plaintiff's RFC and determine, at step five, with the assistance of a VE if necessary, whether there are jobs existing in significant numbers in the national economy that plaintiff can still perform.[20]

## VII.

## CONCLUSION

**IT IS HEREBY ORDERED** that: (1) plaintiff's request for remand is **granted**; (2) the decision of the Commissioner is **reversed**; and (3) this action is **remanded** to defendant for further proceedings consistent with this Memorandum Opinion.

**IT IS FURTHER ORDERED** that the Clerk of the Court serve copies of this Order and the Judgment herein on all parties or their counsel.

**This Memorandum Opinion and Order is not intended for publication, nor is it intended to be included in or submitted to any online service such as Westlaw or Lexis.**

DATED:  January 20, 2015

_____
PAUL L. ABRAMS
UNITED STATES MAGISTRATE JUDGE

---

[20]   Nothing herein is intended to disrupt the ALJ's step four finding that plaintiff is unable to return to his past relevant work.